Se. Auto., Inc. v. Genuine Parts Co., 2017 NCBC 33.

STATE OF NORTH CAROLINA

COUNTY OF CUMBERLAND

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
16 CVS 1186

SOUTHEASTERN AUTOMOTIVE, INC., )
)
    Plaintiff, )
)
    v. )
)
GENUINE PARTS COMPANY, a Georgia )
Corporation d/b/a NAPA AUTO PARTS; )
and JOHN MICHAEL RIESS, II, )
)
    Defendants. )

**OPINION AND ORDER**

THIS MATTER comes before the Court on Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Motion") pursuant to North Carolina Rules of Civil Procedure ("Rule(s)") 12(b)(3) and 12(b)(6).

THE COURT, having considered the Motion, briefs in support of and in opposition to the Motion, the affidavits and other evidentiary materials filed by the parties, and the arguments of counsel at the hearing, concludes that the Motion should be GRANTED for the reasons below.

> *The Law Offices of Lonnie M. Player, Jr., by Lonnie M. Player, Jr., Esq., and Stevens Martin Vaughn & Tadych, LLP, by K. Matthew Vaughn, Esq. for Plaintiff Southeastern Automotive, Inc.*

> *Alston & Bird LLP, by Michael A. Kaeding, Esq. and Ryan P. Ethridge, Esq. for Defendants Genuine Parts Corporation and John Michael Riess, II.*

McGuire, Judge.

## I. Factual and Procedural Background.

1.   Plaintiff Southeastern Automotive, Inc. ("Plaintiff") is an auto parts distributor and retailer which, as of November 2011, had eight (8) locations in

southeast North Carolina. Plaintiff is a closely-held North Carolina corporation with three shareholders: Charlie Harrell, Brandon Harrell, and Eric Prevatte ("Southeastern Owners"). Southeastern's principal place of business is in Cumberland County, North Carolina. (First Amended Complaint ("FAC") ¶¶ 1 – 9.)

2.      Defendant Genuine Parts Company ("GPC") is a national auto parts distributor and retailer that operates under the "NAPA" brand name.[1] It is a Georgia corporation with its principal place of business in Fulton County, Georgia. Defendant John Michael Riess, II ("Riess") is a citizen and resident of Guilford County, North Carolina, who at all relevant times to this lawsuit was employed by GPC as the General Manager of the NAPA distribution center in High Point, North Carolina (collectively, GPC and Riess are the "Defendants"). (FAC ¶¶ 2, 3.)

A.      *The Changeover Transaction.*

3.      In late 2011, Plaintiff agreed to meeting with GPC officials to discuss the feasibility of Plaintiff becoming a NAPA-affiliated auto parts retailer, and in November 2011, the Southeastern Owners met with Riess. Plaintiff alleges that, at this initial meeting, Riess induced it to explore an affiliation with NAPA by suggesting to Brandon Harrell that the majority of the NAPA-affiliated dealers in North Carolina were substantially older than him and that Plaintiff stood to eventually merge with and succeed to an interest in the majority of these dealers as part of GPC's "succession plan" for the region. (FAC ¶¶ 8 – 11.)

---

[1] NAPA's website (www.napaonline.com) states that NAPA is "a division of" GPC.  In this Opinion and Order, the Court uses GPC and NAPA interchangeably.

4. The Southeastern Owners were enticed by the prospect of significantly increasing the size of their business, but had concerns related to NAPA's business model and Plaintiff's ability to fit its existing lines of business within the NAPA model. (FAC ¶ 12.) Plaintiff alleges that NAPA, by and through Riess, addressed each of its concerns and assured the Southeastern Owners that Plaintiff would be able to continue its existing lines of business. (FAC ¶ 14.)

5. In April 2012, Plaintiff agreed with NAPA to begin the process of changing Plaintiff's existing stores to NAPA stores (hereinafter, this process will be referred to as the "Changeover Transaction").

6. Plaintiff alleges Defendants represented that the Changeover Transaction would proceed as follows:

a. Plaintiff would divest itself of its Raleigh, North Carolina location, but would acquire three (3) of GPC's existing, company-owned NAPA locations in Fayetteville, North Carolina;

b. Plaintiff would acquire and merge with then-existing independently owned NAPA locations in Lumberton, St. Paul's, Elizabethtown, Pembroke, Wilmington, and Leland, North Carolina;

c. GPC would conduct an on-site physical inventory of each of Plaintiff's locations;

d. NAPA's proprietary computer-based inventory control systems, TAMS II and Multistore ("MS"), would be installed in Plaintiff's locations; and

e. The data from the on-site inventories conducted by GPC at Plaintiff's locations would be transferred accurately into NAPA's computer inventory-control systems and Plaintiff would be given full and accurate credit for its inventory. (FAC ¶ 16.)

7. On or about February 12 and 13, 2013, the Southeastern Owners traveled to Atlanta, Georgia, to meet with Riess and GPC's President and Chairman of the Board. During one of these meetings, Riess gave Plaintiff assurances that each independently owned NAPA retailer had agreed to the Changeover Transaction and were "ready to do what's best for NAPA." Relying on the representations, Plaintiff and GPC executed the Napa Change-Over Agreement on February 13, 2013 (hereinafter "Changeover Agreement"). (FAC ¶¶ 21 – 25, Ex. A.)

8. The Changeover Agreement provides, in relevant part, that in the process of converting Plaintiff's stores to NAPA stores:

a. NAPA employees would physically inspect and count the existing automotive parts inventory at each of Plaintiff's store locations;

b. NAPA employees would enter the inventory into the TAMS computer inventory system;

c. Plaintiff would have representatives present at all times during the inspection, inventory count, and change-over procedures to observe in order to confirm that the procedures were conducted accurately;

d. After completing each inspection and inventory count, NAPA would print a listing of the store's existing inventory at the agreed-upon pricing and

Plaintiff's representative would sign the inventory listing to confirm that the inspection and inventory counts were performed in an accurate and correct manner;

e. Immediately following the inspection and inventory count, the store's existing inventory would either be "reboxed" as NAPA parts and returned to Plaintiff's inventory or removed and returned to the "manufacturers/suppliers of NAPA." (FAC ¶ 26; Changeover Agmt. §§ 1 – 3.)

9. The Changeover Agreement also requires GPC to provide Plaintiff with two free enrollments for Plaintiff's employees in NAPA's Store Management School. (FAC ¶ 26; Changeover Agmt. § 3.) Additionally, the Changeover Agreement provides that "[t]he inspection and inventory count is scheduled to occur . . . beginning March 1, 2013 and completing the last store in June . . . " (Changeover Agmt. § 1,) and contains a forum selection clause stating "the courts of Georgia shall have jurisdiction over the subject matter of this Agreement and personal jurisdiction over the parties hereto." (*Id.* at § 12.)

10. The Changeover Transaction required a significant capital investment by Plaintiff. (Riess Aff. (8/25/16) ¶ 11; Harrell Aff. ¶ 16.)[2] Plaintiff first sought

---

[2] Both parties submitted affidavits and other evidence regarding Defendants' Rule 12(b)(3) Motion, and neither party has objected to the Court's consideration of these materials. The North Carolina Court of Appeals has held that "consideration is limited to the allegations in plaintiff's complaint" in determining "the form of action" for venue purposes. *McCrary Stone Servs., Inc. v. Lyalls*, 77 N.C. App. 796, 799, 336 S.E.2d 103, 105 (1985). On the other hand, the Court of Appeals also has held that a trial court erred in failing to consider the plaintiff's sworn interrogatory responses in deciding the defendant's motion challenging venue where the only other information in the record regarding the plaintiff's county of residence was the allegation in the unverified complaint. *Kiker v. Winfield*, 234 N.C. App. 363, 365–66, 759 S.E.2d 372, 373–74 (2014); *see also Chow v. Crowell*, 15 N.C. App. 733, 736, 190 S.E.2d 647, 649 (1972) (finding that trial court erred in transferring venue to Transylvania County when verified motions showed defendants were residents of Guilford and Macon Counties, respectively, and only the unverified motion stated a defendant was a

financing from Vantage South Bank, but Vantage declined the loan. (Riess Aff. (8/25/16) ¶ 15; Harrell Aff. ¶¶ 16 – 17.) Plaintiff instead obtained the financing through GPC's "Growth Capital Program." (Riess Aff. (8/25/16) ¶ 17; Harrell Aff. ¶ 17.) The Growth Capital Program is a special loan program established by GPC for independent NAPA store owners. Under the Growth Capital Program, Bank of America ("BOA") makes the loan, and the loan is guaranteed by GPC. (Riess Aff. (8/25/16) ¶ 14.)

11.    In order to participate in the Growth Capital Program and as a condition of GPC's guarantee of the loan, GPC required Plaintiff and the Southeastern Owners to enter into the Guarantee Support Agreement ("GSA"). (*Id.* at ¶ 24, Ex. A.) On February 28, 2013, the Southeastern Owners in their individual capacities, Brandon Harrell on behalf of Plaintiff, and Riess on behalf of GPC, executed the GSA. (Harrell Aff. ¶ 22.) Under the GSA, GPC imposed managerial, operational, and financial requirements on Plaintiff including, *inter alia*: giving GPC two seats on Plaintiff's Board of Directors; requiring GPC's approval for Plaintiff to spend or enter into a contract exceeding $10,000; requiring Plaintiff to purchase 85% of its inventory from GPC and its affiliates; requiring Plaintiff's timely payment to GPC of invoices for inventory; giving GPC certain controls over Plaintiff's inventory and inventory write-offs; permitting GPC to review Plaintiff's operation and capital budgets; and obligating Plaintiff to non-competition covenants. (Riess Aff. (8/25/16) ¶ 25, Ex. A.)

resident of Transylvania County). The Court concludes that it can properly consider the affidavits and other evidence presented by the parties for purposes of deciding Defendants' Rule 12(b)(3) Motion.

12. The GSA contains a forum selection clause which provides in pertinent part as follows:

> THE FEDERAL COURT OF THE NORTHERN DISTRICT OF GEORGIA OR, AT THE OPTION OF GPC, ANY STATE COURT LOCATED IN COBB COUNTY OR FULTON COUNTY, GEORGIA, SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES, PERTAINING, DIRECTLY OR INDIRECTLY, TO THIS AGREEMENT, THE LOAN DOCUMENTS OR TO ANY MATTER ARISING THEREFROM, THE COLLATERAL OR ANY OTHER DOCUMENT EXECUTED AND DELIVERED IN CONNECTION HEREWITH OR THEREWITH.

(GSA ¶ 33(a)) (capitalization in original).

13. On February 28, 2013, the Southeastern Owners also executed a Guaranty agreement ("Guaranty") in their individual capacities to "jointly and severally guaranty to GPC the prompt payment of any and all indebtedness on the part of [Plaintiff] to GPC." (Riess Aff. (8/25/16) ¶ 29, Ex. B; Harrell Aff. ¶ 19.) The Guaranty contains a forum selection clause making Georgia a proper forum for the litigation of disputes arising out of the Guaranty. (Guaranty 2.)

14. On February 28, 2013, Plaintiff and GPC executed a Security Agreement. (Riess Aff. (8/25/16) ¶ 30, Ex. C; Harrell Aff. ¶ 19.) The Security Agreement grants GPC a security interest in certain collateral, mainly the inventory of Plaintiff's stores. The Security Agreement contains a forum selection clause making Georgia a proper forum for the litigation of disputes arising out of the Security Agreement. (Security Agreement § 21.)

15. In or around early March 2013, Plaintiff entered into a Loan Agreement with BOA under the Growth Capital Program ("Loan Agreement"). (Riess Aff. (8/25/16) ¶ 21, Ex. E.) The Loan Agreement provides that Plaintiff "acknowledges and agrees that [GPC] shall guarantee all of the [Plaintiff]'s obligations to [BOA] under" the Loan Agreement, (Loan Agmt. § 3.1(d),) and that "[Plaintiff] recognizes and acknowledges that [BOA] has made credit available to [Plaintiff] hereunder based in part on the credit support of GPC." (*Id.* at § 10.14.) The total financing provided to Plaintiff pursuant to the Growth Capital Program was $7,563,976. (Riess Aff. (8/25/16) ¶ 27.)

B.  *Plaintiff's Allegations.*

16. Plaintiff alleges that "immediately" after entering into the Changeover Transaction, it learned that none of the independent NAPA retail owners had prior knowledge that GPC wanted them to sell their stores to Plaintiff, and that the independent NAPA affiliates in Lumberton and Leland, North Carolina, refused to sell their businesses to Plaintiff. (FAC ¶¶ 27 – 30.) As a result of the Lumberton and Leland NAPA affiliates' refusal to cooperate with the Changeover Transaction, GPC "forced Plaintiff . . . to exit the Lumberton, North Carolina market completely, where Plaintiff had thriving stores, [and] to open a new store . . . in Carolina Beach, North Carolina, where previous auto parts stores had failed." (FAC ¶ 30.) GPC also "forced" Plaintiff to agree to a non-competition agreement excluding it from the market surrounding Leland for a period of five (5) years. (FAC ¶ 31.)

17.     Plaintiff alleges that, in violation of the terms of the Changeover Agreement, Plaintiff's stores in Pembroke, St. Paul's, and Elizabethtown "were not inventoried at all but rather their shelves were simply emptied onto . . . NAPA's tractor trailer truck and hauled away." (FAC ¶¶ 32 – 33.)  Additionally, Plaintiff's stores in Raleigh, Lumberton, and Wilmington were not inventoried under the procedures required by the Changeover Agreement (FAC ¶¶ 34 – 36,) and the TAMS II and MS systems erroneously overstocked Plaintiff's stores with unnecessary inventory for which Plaintiff was required to pay GPC. (FAC ¶¶ 37 – 48.)

18.     Many months later, GPC announced that its counts of Plaintiff's inventory had produced a shortfall of $1,400,000.00 from what was represented in Plaintiff's books. GPC notified Plaintiff that it expected Plaintiff to write-off the inventory shortfall. (FAC ¶52.) Plaintiff disputes the legitimacy of GPC's inventory count and has refused to approve the write off. (FAC ¶¶ 53 – 55.)  Plaintiff alleges "[u]pon information and belief, the errors in inventory control, alleged counting and reporting which led [GPC] to demand Plaintiff write $1,400,000.00 off its books with no compensation are entirely those of [GPC]." (FAC ¶ 56.)

C.     *The Lawsuit, Removal to Federal Court, and Remand.*

19.     On February 12, 2016, Plaintiff filed its Complaint in Cumberland County Superior Court ("Complaint"). The Complaint contains claims for breach of contract against GPC (Claim One), and fraud (Claim Two) and unfair and deceptive trade practices (Claim Three) against both GPC and Riess.

20. On March 22, 2016, Defendants filed a Notice of Designation transferring this case to the North Carolina Business Court, and the case was designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. § 7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."). On March 23, 2016, the case was assigned to the undersigned Special Superior Court Judge for Complex Business Cases by Order of Chief Judge James L. Gale.

21. On March 25, 2016, Defendants removed this action to the United States District Court for the Eastern District of North Carolina ("Eastern District") on the basis of diversity of citizenship jurisdiction. Defendants asserted that the federal court had jurisdiction over the case despite the fact that Riess was a resident of North Carolina because Southeastern had fraudulently joined him as a defendant to avoid diversity jurisdiction.

22. On April 1, 2016, Defendants filed in the Eastern District a Motion to Dismiss the Complaint and a Motion to Transfer the case to the United States District Court for the Northern District of Georgia ("Northern District of Georgia"). Defendants' Motion to Transfer was based on the GSA's exclusive forum-selection clause.

23. On April 1, 2016, Plaintiff filed in the Eastern District a Motion to Remand the case back to Cumberland County Superior Court.

24. On April 22, 2016, Plaintiff filed the FAC in the Eastern District. The FAC is identical to the Complaint except that it amends the allegation in paragraph 25 regarding the date that Plaintiff entered into the Changeover Agreement.

25. On July 5, 2016, Eastern District Chief Judge James C. Dever, III, issued an order transferring the case to the Northern District of Georgia, pursuant to 28 U.S.C. § 1404(a) ("Transfer Order"). *Southeastern Auto., Inc. v. Genuine Auto Parts Co.*, No. 5:16-CV-130-D, 2016 U.S. Dist. LEXIS 86778 (E.D.N.C. July 5, 2016). Judge Dever transferred the case based on the GSA's exclusive forum selection clause, holding:

> Southeastern Automotive is a sophisticated business entity and is bound by the contractual terms that it reached with Genuine Auto Parts Company . . . . Here, the forum-selection clause is valid, and the dispute falls within the forum-selection clause . . . . Indeed, Southeastern Automotive's arguments to the contrary are specious.

*Id.* at *2 – 3. The Transfer Order did not address Southeastern's Motion to Dismiss.

26. The case was transferred to the Northern District of Georgia and assigned civil action number 1:16-CV-2442-LMM. On July 15, 2016, the Honorable Leigh Martin May of the U.S. District Court for the Northern District of Georgia granted Plaintiff's Motion to Remand. Judge May held that Plaintiff had not fraudulently joined Riess, and remanded the case to state court based on the lack of complete diversity between the parties. (Slip Op. 12 – 14.)

27. On August 26, 2016, Defendants filed the Motion seeking dismissal, without prejudice, of the FAC pursuant to Rule 12(b)(3) on the basis of improper venue. Alternatively, Defendants seek dismissal of Plaintiff's claims for fraud and

unfair and deceptive trade practices claims pursuant to Rule 12(b)(6). Having been fully briefed and argued in front of the Court, the Motion is now ripe for determination.

## II. Analysis.

28. Defendants move to dismiss the FAC without prejudice pursuant to Rule 12(b)(3) on the grounds that the GSA's exclusive forum-selection clause covers the claims raised by Plaintiff and mandates those claims be pursued in Georgia. Defendants also argue that Southeastern's claims for fraud and violation of the North Carolina Unfair and Deceptive Trade Practices Act, G.S. § 75-1.1, *et seq.* ("UDTPA"), are subject to dismissal with prejudice under Rule 12(b)(6).

29. Pursuant to G.S. § 1-83, when a party raises an objection to venue, "the question of removal then becomes a matter of substantial right, and the court of original venue is without power to proceed further in essential matters until the right of removal is considered and passed upon." *Casstevens v. Wilkes Tel. Membership Corp.*, 254 N.C. 746, 750, 120 S.E.2d 94, 96-97 (1961); *see also Aldridge v. Kiger*, 2016 NCBC LEXIS 85, *5 (N.C. Super. Ct. 2016). The Court must first determine the question of venue because if the venue in this Court is improper Plaintiff's claims must be dismissed without prejudice and the Court need not reach Defendants' Rule 12(b)(6) Motion.

A.  *Defendants' arguments for dismissal on the basis of improper venue.*

30.  Defendants first argue that Plaintiff is collaterally estopped from contesting the applicability of the forum selection clause in the GSA by the Transfer Order. (*Id.* at 10 – 12.)

31.  Defendants contend that if Plaintiff is not estopped from contesting the applicability of the forum-selection clause, the GSA, Changeover Agreement, Guaranty, and Security Agreement were all part of the Changeover Transaction, but that "[t]he primary contract underlying the Changeover Transaction is [the GSA]." (Defs.' Mem. Supp. Mot. Dismiss 3.) Defendants argue that "[t]he Changeover Transaction could not have happened without the GSA and GPC's guaranty of the [BOA] Loan." (*Id.* at 4.) Defendants contend that the GSA's broad forum-selection clause is mandatory and applies to all of Plaintiff's claims, and requires this Court to dismiss those claims on the basis of improper venue. (*Id.* at 9 – 18.)

B.  *Plaintiff's arguments in opposition to Defendants' Motion to Dismiss for improper venue.*

32.  Plaintiff contends that the forum-selection clause in the GSA does not apply to this lawsuit because Plaintiff's claims arise solely from Defendants' breach of, and misrepresentations surrounding, the Changeover Agreement. (Pl.'s Br. Opp. Mot. Dismiss 9 – 12.) Plaintiff argues that its "claims are grounded entirely in the Defendants' misrepresentations that induced [Plaintiff] to sign the Changeover Agreement, and GPC's failures to comply with the terms of that Agreement." (*Id.* at

10.) Since the forum provision in the Changeover Agreement is not mandatory, Plaintiff contends that venue properly lies in this Court. (*Id.*)

33.     Plaintiff also argues that the forum-selection clause in the GSA cannot be enforced because it violates G.S. § 22B-3, which prohibits mandatory forum selection clauses in certain contracts entered into in North Carolina. (*Id.* at 7 – 9.)

34.     Finally, Plaintiff argues that the forum-selection clause in the GSA cannot be enforced because it was the product of "unequal bargaining power", and it would be unfair to enforce the clause. (*Id.* at 12 – 14.)

C.      *Collateral estoppel does not preclude Plaintiff's arguments against the applicability of the forum-selection clause in the GSA.*

35.     Defendants contend that Plaintiff is collaterally estopped in this Court from disputing the applicability and validity of the GSA's forum selection clause because those issues were raised, litigated, and determined in the Transfer Order. Plaintiff argues, *inter alia*, that it is not estopped from raising the issues because the Transfer Order was not a final judgment on the merits. (Pl.'s Br. Opp. Mot. Dismiss 14 – 15.)

36.     "Under collateral estoppel as traditionally applied, a ***final judgment*** on the merits prevents relitigation of issues actually litigated and necessary to the outcome of the prior action in a later suit involving a different cause of action between the parties or their privies." *Thomas M. McInnis & Assocs., Inc. v. Hall*, 318 N.C. 421, 428 – 29, 349 S.E.2d 552, 557 (1986) (citing Restatement (Second) of Judgments § 27  (1982) (emphasis added); *State ex rel. Tucker v. Frinzi*, 344 N.C. 411, 414, 474 S.E.2d 127, 128 (1996). The elements of collateral estoppel are: "(1) a

prior suit resulting in a final judgment on the merits; (2) identical issues involved; (3) the issue was actually litigated in the prior suit and necessary to the judgment; and (4) the issue was actually determined." *Bluebird Corp. v. Aubin*, 188 N.C. App. 671, 678, 657 S.E.2d 55, 61 (2008); *McCallum v. North Carolina Coop. Extension Serv. of N.C. State Univ.*, 142 N.C. App. 48, 52, 542 S.E.2d 227, 231 (2001) ("[W]hen an issue has been fully litigated and decided, it cannot be contested again between the same parties, even if the adjudication is conducted in federal court and the second in state court."). "The burden of establishing that a claim is barred by collateral estoppel is on the party relying upon the doctrine." *Id.*

37.     Defendants argue that the Transfer Order was a final judgment for the purpose of collateral estoppel because Judge Dever "determined the entire controversy" before the Eastern District when he transferred the matter to the Northern District of Georgia. Defendants cite in support of their argument *Ratchford v. C.C. Mangnum, Inc.*, in which the Court of Appeals noted that "[a] final judgment is one that determines the entire controversy between the parties, leaving nothing to be decided in the trial court." 150 N.C. App. 197, 199, 564 S.E.2d 245, 247 (2002). The "entire controversy" in this case was all of the claims raised by Plaintiff's FAC. While the Transfer Order may have "determined" the venue issue raised by Defendants' Motion to Transfer, the Transfer Order did not "determine the entire controversy between the parties" and was not a final judgment for the purpose of collateral estoppel. To the contrary, the Transfer Order was clearly interlocutory in nature and decided only a single procedural question involved in

the lawsuit between the parties. *Branch v. Carolina Shoe Co.*, 172 N.C. App. 511, 518, 616 S.E.2d 378, 383 (2005). (noting an order is interlocutory when it "does not determine the issues joined in the suit, but merely directs some further proceedings preparatory to the final decree."). Since the Transfer Order was not a final order, Defendants' collateral estoppel argument must fail.

D.     *The forum-selection clause in the GSA is mandatory.*

38.     In North Carolina, venue usually is fixed by statute. Venue, however, "is not jurisdictional, and may be waived by any party or changed by consent of the parties, express or implied." *Casstevens*, 254 N.C. at 749, 120 S.E.2d at 96. Accordingly, "a contractual forum selection clause can modify [the statutory] default venue rule. *Lendingtree v. Anderson*, 228 N.C. App. 403, 408, 747 S.E.2d 292, 297 (2013)

39.     The general rule is that mandatory forum selection clauses contained in contracts are enforced in North Carolina. *Id.* "[M]andatory forum selection clauses recognized by our appellate courts have contained words such as 'exclusive' or 'sole' or 'only' which indicate that the contracting parties intended to make jurisdiction exclusive." *Printing Servs. of Greensboro, Inc. v. Am. Capital Group, Inc.*, 180 N.C. App. 70, 74, 637 S.E.2d 230, 232 (2006) (citation omitted). Once it is established that a forum selection clause is mandatory, a party "seeking to avoid enforcement . . . carries a heavy burden and must demonstrate that the clause was the product of fraud or unequal bargaining power or that

enforcement of the clause would be unfair or unreasonable." *Perkins v. CCH Computax, Inc.*, 333 N.C. 140, 146, 423 S.E.2d 780, 784 (1992).

40.     The forum selection clause in the GSA clearly provides that Georgia Courts shall have "exclusive jurisdiction to hear any claims or disputes between the parties . . . ." (GSA § 33.) Plaintiff does not dispute, and the Court therefore concludes, that the forum selection clause in the GSA is mandatory.

E.     *The forum-selection clause is not void under N.C. Gen. Stat. § 22B-3.*

41.     The Court will next consider Plaintiff's contention that the mandatory forum selection clause in the GSA is void and unenforceable pursuant to G.S. § 22B-3. (Pl.'s Br. Opp. Mot. Dismiss 7 – 9.) If Plaintiff is correct, the Court need not consider Defendants' argument that the forum selection clause requires dismissal of Plaintiff's claims, and Defendants' Rule 12(b)(3) Motion must be denied.  G.S. § 22B-3 provides, in relevant part, as follows:

> Except as otherwise provided in this section, any provision in a contract entered into in North Carolina that requires the prosecution of any action or arbitration of any dispute that arises from the contract to be instituted or heard in another state is against public policy and is void and unenforceable. This prohibition shall not apply to non-consumer loan transactions . . . .

42.     It is undisputed that the GSA was entered into in North Carolina. Accordingly, Plaintiff asserts that the forum selection clause requiring all claims be pursued in Georgia is void and unenforceable. (*Id.* at 7 – 8.)

43.     In its Brief, Plaintiff preemptively argues that the exception in G.S. § 22B-3 for forum selection agreements contained in "non-consumer loan

transactions"[3] does not apply because the GSA is not a "loan." In support, Plaintiff relies on *SED Holding, LLC v. 3 Star Props., LLC*, __ N.C. App. __, __, 784 S.E.2d 627 (2016). In *SED Holding*, the Court of Appeals rejected the argument that a contract for the sale of mortgages constituted a "loan transaction" because it involved "a 'conditional sale' that anticipated a secured loan." *Id.*, 784 S.E.2d at 631. The Court held that "[a] loan is 'an agreement to advance money or property in return for the promise to make payments therefor, whether such agreement is styled as a loan, credit card, line of credit, a lease or otherwise.'" *Id.* (quoting *L.C. Williams Oil Co.*, 130 N.C. App. at 289, 502 S.E.2d at 417). With little discussion, the Court of Appeals found that the G.S. § 22B-3 "non-consumer loan transaction" exception did not apply because the "plain language" of the agreement at issue contemplated a "sale of pooled mortgages, not a loan." *SED Holding*, __ N.C. App. at __, 784 S.E.2d at 631. Although it narrowly construed the meaning of "loan" in G.S. § 22B-3, the Court of Appeals in *SED Holding* did not address the scope of the word "transaction."

44.     Plaintiff argues the GSA cannot be construed as a "non-consumer loan transaction" because the GSA, like the sales contract in *SED Holdings*, is not an agreement for a loan. Plaintiff contends that the loan agreement involved in the Changeover Transaction was between Plaintiff and BOA, and that "GPC was not a party to" the loan agreement. (Pl.'s Br. Opp. Mot. Dismiss 8.)

---

[3] The Court of Appeals has held "a 'non-consumer loan' is one *not* extended to a natural person, and *not* used for 'family, household, personal or agricultural purposes.'" *L.C. Williams Oil Co. v. NAFCO Capital Corp.*, 130 N.C. App. 286, 290, 502 S.E.2d 415, 418 (1998). Plaintiff does not contend that the Changeover Transaction involved a "consumer loan."

45.     Defendants contend, however, that Plaintiff's interpretation of G.S. § 22B-3 effectively reads the word "transaction" out of the statute and incorrectly construes the exception as being limited to non-consumer loan <u>agreements</u> rather than loan <u>transactions</u>. (Defs.' Reply Br. Supp. Mot. Dismiss 6 – 8.) Defendants argue that the term "loan agreement" is used throughout the General Statutes,[4] indicating that the General Assembly's usage of the term "non-consumer loan transactions," rather than "non-consumer loan agreements," was intended to exclude more than simply loan agreements from the scope of G.S. § 22B-3. (*Id.* at 7.) Additionally, Defendants point out that G.S. § 53-244.111 lists acts that are unlawful if committed "in the course of any residential mortgage loan transaction." The list of unlawful acts includes acts that typically would fall outside the scope of the loan agreement itself, such as acts involving brokerage commissions, real estate appraisals, and mortgage transferring services. G.S. § 53-244.111(4), (9), (11), (12). Defendants argue that the use of "*transaction*" to encompass acts outside of the mortgage loan contract itself suggests that "loan transaction" is broader than "loan agreement." (Defs.' Reply Br. Supp. Mot. Dismiss 7.)

46.     Since G.S. § 22B-3 does not define "loan transaction," the Court must rely upon the rules of statutory construction to ascertain its breadth. *L.C. Williams Oil Co.*, 130 N.C. App. at 289, 502 S.E.2d at 417 (1998). "Statutory interpretation

---

[4] Although Defendants claim the term "loan agreement" is used over 69 times in the North Carolina General Statutes, they do not specifically cite the Court to any of the statutes containing "loan agreement." The Court's own research revealed, however, that the term "loan agreement" is used at least 69 times in the General Statutes, including in, e.g.: G.S. §§ 75-20(a)(1), (2), (3); 131A-8(2), (4), (5); 159I-3(a)(4), (8), (10).

presents a question of law, and the cardinal principle thereof is to ensure accomplishment of the legislative intent." *Id.*

> The principal goal of statutory construction is to accomplish the legislative intent. The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, "the spirit of the act and what the act seeks to accomplish." If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so.

*Lenox, Inc. v. Tolson*, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (citations omitted).

47.     The parties have not directed the Court to any North Carolina court decisions that have addressed the meaning of the term "loan transaction" or the word "transaction" as used in section 22B-3. The intended meaning of the language does not make itself clear in this case through its context, but there is nothing to suggest that "loan transaction" was intended to strictly limit the exception to forum-selection clauses found only within a contract extending the actual loan.

48.     The General Assembly's use of the terms "loan agreement" and "loan transaction"[5] in other statutes also is not particularly instructive in this analysis. The Court has surveyed the use of these terms in the General Statutes and cannot conclude that either "loan agreement" or "loan transaction" have such fixed and consistent meanings that the intent of section 22B-3 is made clear.

---

[5] The Court's research found that the term "loan transaction" is used at least 20 times in the General Statutes. In addition to G.S. § 53-244.111, "loan transaction" is also used in statutes including: G.S. §§ 25A-1; 45-81(1), 45-82.2(d), 45-93(2)(b); 143C-4-5.

49.     The dictionary definition of "transaction" also fails to provide a definitive answer as to its intended use in the statute at issue. *Perkins v. Arkansas Trucking Servs.*, 351 N.C. 634, 638, 528 S.E.2d 902, 904 (2000) ("In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute."). "Transaction" is a noun defined as: "1. the act of transacting or the fact of being transacted; 2. an instance or process of transacting something; 3. something that is transacted, especially a business agreement."[6] Again, the definition of "transaction" does not suggest it was used in G.S. § 22B-3 to limit the exception to forum-selection clauses found within one document or type of document that might be involved in a non-consumer loan.

50.     With regard to the legislative intent behind G.S. § 22B-3, the Court of Appeals has held:

> Our General Assembly drafted G.S. § 22B-3 out of concern that enforcement of forum selection clauses would work to the disadvantage of the general public. Thus, the statute was drafted broadly, allowing exception solely for "non-consumer loan transactions," in the interest of *protecting consumers and those with little bargaining power.*

*L.C. Williams Oil Co.*, 130 N.C. App. at 289, 502 S.E.2d at 417 (citation omitted; emphasis added). The intent behind the statute supports the conclusion that it was intended to protect individual North Carolina consumers when dealing with loans made by lending businesses, and not relatively sophisticated businesses involved in large commercial transactions. *Id.* at 292, 502 S.E.2d at 419 (holding that agreement at issue fell within the "non-consumer loan transaction" exception where

---

[6] http://www.dictionary.com/browse/transaction?s=t

"the agreement contemplated a commercial transaction, and not a consumer one. The loan was intended for the mutual benefit of plaintiff and defendant, both corporate entities and not 'natural persons.'"). The statute does not appear to be aimed at the type of transaction involved in this case.

51.     Under the circumstances present here, including the use of the term "loan transaction" rather than "loan agreement" or "loan contract," and considering the intent behind G.S. § 22B-3, the Court concludes that by using the term "non-consumer loan transaction," the General Assembly intended for the exception to apply more broadly than to forum-selection provisions contained strictly within a document constituting a loan agreement. Accordingly, the Court also concludes that the fact that the GSA itself is not a contract for a loan does not mean that it cannot be part of a "consumer loan transaction" to which the exception in G.S. § 22B-3 applies.

52.     The Court must determine whether the GSA was a contract made as part of a non-consumer loan transaction. Plaintiff does not dispute that there was a non-consumer loan involved in the Changeover Transaction, or that the loan was necessary in order to allow it to acquire the additional store locations and fulfill other obligations under the Changeover Transaction.

53.     There also is no question that the GSA was necessary to the Changeover Transaction. BOA required GPC to act as a guarantor of the loan to Plaintiff. In turn, to protect its interests as guarantor of the loan, GPC required

Plaintiff to enter into the GSA, which imposed significant managerial, operational, and financial conditions on Plaintiff.

54.     The GSA and the Loan Agreement cross-reference each other. In the GSA, Plaintiff is referred to as the "Borrower." (GSA 1, preamble.) The GSA makes specific reference to the loan "between Borrower and Bank of America", and states that "[Southeastern Owners] and Borrower desire to have GPC guarantee" the loan. (*Id.* at 1.) The GSA also requires Plaintiff and the Southeastern Owners to "comply with . . . covenants and obligations in the [loan]." (*Id.* at § 1.)

55.     The Loan Agreement between Plaintiff and BOA is expressly tied to the "Growth Capital Program," and also refers to Plaintiff as "Borrower." (Loan Agmt. 1.) The Loan Agreement provides that "[B]orrower acknowledges and agrees that [GPC] shall guarantee all of the Borrower's obligations to the Bank under this Agreement," (*Id.* at § 3.1(d),) "[t]he Borrower recognizes and acknowledges that [BOA] has made credit available to the Borrower hereunder based in part upon the credit support of GPC." (*Id.* at § 10.13.) Plaintiff even admits that "Bank of America relied upon the inventory return rights granted pursuant to the GSA, in extending [the loan] to Southeastern." (Pl.'s Br. Opp. Mot. Dismiss 6.)

56.     The facts establish that the loan from BOA to Plaintiff was a non-consumer loan, and that the GSA was integral to the loan. The Court concludes that the GSA was executed as part of a "non-consumer loan transaction"[7] within the

---

[7] It would not be inconsistent to conclude that the Changeover Transaction itself was not, strictly speaking, a "loan", but that the BOA loan to Plaintiff was a non-consumer loan used to fund the Changeover Transaction and that the GSA was an indispensable part of that loan transaction.

meaning of that term in G.S. § 22B-3, and the forum selection clause is not void and unenforceable under the statute.

      F.     *The forum-selection clause was not the product of fraud or unequal bargaining power.*

57. Plaintiff further contends that, even if G.S. §22B-3 doesn't render the forum-selection clause in the GSA unenforceable, enforcement should be denied because of Defendants' "fraud and unequal bargaining power" over Plaintiff and because Rule 12(b)(3) dismissal would be unfair or unreasonable.[8] (*Id.* at 12 – 14.) A party seeking to establish that a forum selection clause was the product of fraud or unequal bargaining power, or that enforcement would be unfair or unreasonable, "carries a heavy burden." *Perkins v. CCH*, 333 N.C. at 146, 423 S.E.2d at 784; *Cox v. Dine-A-Mate, Inc.*, 129 N.C. App. 773, 776, 501 S.E.2d 353, 355 (1998) (citing *Perkins*).

_____

[8] The parties argue North Carolina case law concerning whether the GSA's Forum Selection Clause is unenforceable due to unequal bargaining power and other public policy considerations. As the GSA's choice of law provision states "THIS AGREEMENT IS A CONTRACT MADE UNDER AND SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF GEORGIA," the Court believes that Georgia law may be applicable to this issue. *Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 262, 261 S.E.2d 655, 656 (1980) ("This Court has held that where parties to a contract have agreed that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a [ ] provision will be given effect. Thus by the provisions of this contract, the law of the Commonwealth of Virginia governs our *determination of its validity*.") (emphasis added). Georgia law on the public policy considerations regarding forum selection clauses differs minimally from North Carolina law on the subject. *Iero v. Mohawk Finishing Prods.*, 243 Ga. App. 670, 672, 534 S.E.2d 136, 139 (2000) ("Absent case-specific evidence that there was a 'manifest disparity' in bargaining position, or that Mohawk obtained Iero's assent to the forum selection clause through fraud or overreaching, or that the enforcement of the clause violates public policy, [the court] will enforce the [forum selection] clause."). Therefore, the Court concludes that analyzing Plaintiff's arguments under North Carolina rather than Georgia law will have no effect on the outcome of the issue, and will apply North Carolina law.

58.     In support of its argument, Plaintiff claims only that the "GSA was presented to [Plaintiff] the day before the changeover process was to commence." (Pl.'s Br. Opp. Mot. Dismiss 13.)[9] Plaintiff contends that it had no choice but execute the GSA because "[Plaintiff] had by that time gone to extensive effort and expense preparing for the changeover, including efforts financed by a short-term loan that was due to be paid from the proceeds of changeover financing from Bank of America. Mr. Reiss represented that the GSA was required by Bank of America for the changeover financing, and pressured [Plaintiff] to execute the GSA immediately or the changeover would be delayed." (*Id.*)

59.     Plaintiff's argument is meritless. First, the fact that GPC presented the GSA to Plaintiff the day prior to the scheduled start of the changeover process, even in true, does not support its assertion that the forum-selection clause was obtained by fraud. Plaintiff has not alleged nor argued that GPC made any representations, let alone false representations, to Plaintiff regarding the forum-selection clause which induced them to agree to the forum selection clause. In fact, in the GSA Plaintiff and the Southeastern Owners expressly acknowledged that prior to executing the GSA they "had [an] opportunity to review and ask questions regarding [the GSA] . . . and to discuss the same with their counsel." (GSA § 30.)

60.     In addition, the facts in the record before the Court simply do not support the claim that the forum-selection clause resulted from the unequal bargaining power between the parties. At the time it executed the GSA, Plaintiff

---

[9] The Court notes that Defendants dispute the claim that Plaintiff did not have knowledge of the GSA prior to February 28, 2014, but for purposes of deciding the Motion accepts Plaintiff's allegation as true.

operated eight retail locations in southeastern North Carolina and produced millions of dollars in annual revenue. Clearly Plaintiff was not an unsophisticated party. Plaintiff has not established that GPC abused its bargaining power or manipulated Southeastern's owners into agreeing to any unreasonable or unconscionably one-sided terms within the GSA. The Court also does not believe that enforcement of the GSA's Forum Selection Clause would be "unfair or unreasonable."[10] Therefore, the Court concludes that the forum-selection clause is not unenforceable because it was obtained through fraud or an assertion of unequal bargaining power.

G. *Plaintiff's claims pertain to the GSA's forum-selection clause.*

61. Having concluded that the forum-selection clause in the GSA is enforceable, the Court must decide whether Plaintiff's claims in this action fall under that clause and require dismissal for improper venue.

62. The Court must first determine which state's law applies to interpreting the scope of the forum-selection clause. *Generation Co., LLC v. Holiday Hospitality Franchising, LLC,* No. 5:15-CV-220-FL, 2015 U.S. Dist. LEXIS 156680,

---

[10] Plaintiff contends that "because three years have now passed since the parties entered into the Changeover Agreement, granting Defendants' Motion to Dismiss could potentially deny Plaintiff its day in court on at least part of its claims" and "[s]uch a result would be unfair and unreasonable." (Pl.'s Br. Opp. Mot. Dismiss 13.) Plaintiff apparently means that its claims could be barred by applicable Georgia statutes of limitations if it is forced to re-file in Georgia. Georgia's "savings statute," however, permits a plaintiff, whose timely action is dismissed without prejudice to refile the action within six months of the dismissal. Ga. Code Ann. § 9-2-61 (2016). This statute "applies to involuntary, as well as voluntary dismissals" when the merits of the case have not been adjudicated. *Owens v. Hewell,* 222 Ga. App. 563, 564, 474 S.E.2d 740, 741 (1996). Plaintiff does not argue that any of its claims would be time-barred in Georgia, and it appears Plaintiff filed its claims for breach of contract, Ga. Code Ann. § 9-3-24 (2016), and fraud, *Id.* § 9-3-31 (2016), within the applicable Georgia statutes of limitations. The Court rejects Plaintiff's argument that granting Defendants' Motion to Dismiss would be "unfair and unreasonable."

*10 – 11 (E.D.N.C. Nov. 19, 2015) ("Interpreting a forum-selection clause first requires the court to ascertain what law applies to the contract, because the court must apply that law to decide the scope of the contract's relevant clauses."); *Martinez v. Bloomberg LP*, 740 F.3d 211, 218, 2014 U.S. App. LEXIS 686, *12 (2d Cir. 2014) (noting that in interpreting whether a forum-selection clause encompasses the claims "we normally apply the body of law selected in an otherwise valid choice-of-law clause.").

63. Here, both the GSA and the Changeover Agreement provide that Georgia law shall be applied to their interpretations. North Carolina courts will enforce a contractual choice of law provision as long as the parties have a reasonable basis for their choice, and the law of the chosen state does not violate a fundamental public policy of North Carolina. *Cable Tel Servs. v. Overland Contr.*, 154 N.C. App. 639, 643–44, 574 S.E.2d 31, 34 (2002); *Torres v. McClain*, 140 N.C. App. 238, 241, 535 S.E.2d 623, 625 (2000). GPC is a Georgia corporation headquartered in Georgia, so there is a reasonable basis for the choice of Georgia law, and neither party contends that application of Georgia law would violate North Carolina public policy. The Court concludes that Georgia law applies to this issue.

64. Defendants contend that the forum selection clause encompasses the claims raised by Plaintiff in this lawsuit because the GSA, along with the Changeover Agreement, Security Agreement and Guaranty "make up the Changeover Transaction, and the GSA serves as the primary, core agreement between the parties." (Defs.' Br. Supp. Mot. Dismiss 15.) Defendants argue that

"[Plaintiff]'s breach of contract, fraud, and unfair and deceptive trade practices claims arise from the Changeover Transaction" and that because "the GSA's broad forum-selection clause governs all disputes 'pertaining, directly or indirectly, to' the Changeover Transaction, it applies to [Plaintiff]'s claims in this case." (*Id.* at 13.)

65.     Plaintiff argues that its claims "are grounded entirely in the Defendants' misrepresentations that induced [Plaintiff] to sign the Changeover Agreement, and GPC's failures to comply with the terms of that Agreement." (Pl.'s Br. Opp. Mot. Dismiss 10.) Plaintiff contends that the forum-selection clause in the GSA does not apply because it "is neither referenced in nor necessary to Plaintiff's Amended Complaint." (*Id.*) Plaintiff claims that Defendants "attempt to re-frame Plaintiff's causes of action as arising not from the Changeover Agreement, but rather, from the "Changeover Transaction." (*Id.* at 11.)

66.     To the extent Plaintiff argues that the forum selection clause in the GSA cannot apply to claims arising from the Changeover Agreement simply because they are separate contracts entered into on different dates, Plaintiff is incorrect. (*Id.* at 10 – 12.) Georgia has recognized that "nothing . . . mandates that contracts must be contemporaneous and construed as one contract in order for a forum selection clause in one contract to apply to an action concerning multiple, interrelated contracts." *Cemex Constr. Materials Fla., LLC v. LRA Naples, LLC*, 334 Ga. App. 415, 416, 779 S.E.2d 444, 445 – 46 (2015).

67.     In *Cemex Constr. Materials*, Cemex Construction Materials ("Cemex") and LRA Naples ("LRA") were parties to the "Four-Party Agreement" and three

other prior agreements that were modified by the Four-Party Agreement. The Four-Party Agreement contained a forum-selection clause that provided "[v]enue for any action concerning this Agreement shall be in Lee County, Florida." *Id.* at 415, 779 S.E.2d at 445. The three prior agreements did not contain forum-selection clauses. *Id.* The Four-Party Agreement also provided for a "Lease Termination Payment." LRA filed a complaint in Georgia state court alleging LRA "did not receive sufficient credit against the 'Lease Termination Payment' due to various breaches of the pre-existing contracts by Cemex and ask[ed] the court to declare that it is relieved from its obligation to make the 'Lease Termination Payment.'" *Id.* Cemex moved to dismiss LRA's complaint for improper venue based on the forum-selection clause, but the trial court denied the motion. *Id.*

68.     The Georgia Court of Appeals reversed the trial court. The Court held that "[t]he language in the forum selection clause is broad – it applies to 'any action concerning' the Four-Party Agreement." *Id.* at 416, 779 S.E.2d at 445. The Court further held LRA "seeks relief from a payment due date contained within the Four-Party Agreement. We therefore conclude that the complaint is 'any action concerning' the Four-Party Agreement." *Cemex Constr.* 334 Ga. App. at 416, 779 S.E.2d at 445–46 ("[LRA]'s argument that the forum selection clause does not apply because the Four-Party Agreement was intended to be a separate, nonintegrated agreement does not require a different result. The resolution of this case turns on whether the action concerned the Four-Party Agreement, which it clearly does, and

not whether the Four-Party Agreement was intended to be integrated with the pre-existing contracts.").

69.     To determine whether the parties intended Plaintiff's claims in this action to be covered by the forum-selection clause in the GSA, the Court must look to the language used in the forum-selection clause. The forum-selection clause provides, in pertinent part, that Georgia courts "shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties, pertaining, directly or indirectly, to this Agreement, the Loan Documents[11] or to any matter arising therefrom, the collateral or any other document executed and delivered in connection herewith or therewith." The word "pertain" is defined as "to have reference or relation; relate."[12] This is virtually identical to the definition of "concerning" that the court in *Cemex Constr. Materials* characterized as creating a "broad" forum-selection clause. *Id.* at 416, 779 S.E.2d at 445. In addition, "pertaining" is modified by "directly or indirectly," further increasing its breadth.

70.     The allegations in the FAC involve several parts of the Changeover Transaction. Plaintiff contends that its claims go beyond ones arising only from the Changeover Agreement itself. In the FAC, Plaintiff defines the "Changeover" as "the process of Plaintiff's transition to its affiliation with Defendant NAPA." (FAC ¶ 15.) Plaintiff separately defines "Changeover Agreement" as limited to the contract executed by the parties on February 13, 2013. (*Id.* at ¶ 25.) Plaintiff alleges that the "Changeover" included, *inter alia*, Plaintiff's acquisition of three of GPC's company-

---

[11] The GSA defines the "Loan Documents" as the Loan Agreement "and other ancillary documents." (GSA, preamble.)

[12] http://www.dictionary.com/browse/pertaining?s=t.

owned locations (*Id.* at ¶ 16(a)), and Plaintiff's acquisition of and merger with independently owned NAPA locations in Lumberton, St. Paul's, Elizabethtown, Pembroke, Wilmington, and Leland, North Carolina (*Id.* at ¶ 16(c)). The Changeover Agreement does not cover Plaintiff's acquisition of other store locations. In other words, Plaintiff defines the "Changeover" at issue in this action as broader than simply the part of the transaction covered by the Changeover Agreement.

71. Plaintiff specifically alleges that GPC made false representations for the purpose of inducing Plaintiff to enter into the "Changeover," and not the "Changeover Agreement." (*Id.* at ¶¶ 64, 66, 71.) Some of the misrepresentations related directly to the stores Plaintiff was to acquire as part of the Changeover Transaction. (*Id.* at ¶¶ 64(d) and (e).) These allegations underlie Plaintiff's claims for fraud and unfair and deceptive trade practices. (FAC ¶¶ 71, 72.)

72. In addition, the primary injury Plaintiff claims in this lawsuit is the financial loss it will suffer if Plaintiff is forced by GPC to write off approximately $1.4 million of Plaintiff's inventory. (*Id.* at ¶¶ 52 – 56.) This write off directly impacts the "Collateral" relied on by GPC in entering into the GSA to guarantee the BOA loan. The Security Agreement between Plaintiff and GPC defines "Collateral" as including Plaintiff's "personal and fixture property of every kind and nature . . . including inventory . . . ." (Security Agmt. 1.) Under these circumstances, Plaintiff cannot seriously dispute that the claims in this lawsuit "pertain[ ], directly or indirectly, to . . . the Collateral." (GSA § 33(a).)

73.     Plaintiff also apparently alleges that it has been harmed by other actions taken by GPC. Plaintiff claims that, as a result of GPC's misrepresentations regarding the willingness of certain independent store owners to sell their locations to Plaintiff, GPC "forced Plaintiff . . . to exit the Lumberton [ ] market" and open new locations in unfavorable markets and "forced Plaintiff to agree to a non-competition agreement excluding Plaintiff" from the Leland, North Carolina market (FAC ¶¶ 30 – 31.) Plaintiff does not allege from where GPC got the right to "force" it to exit the Lumberton and Leland markets, but there are no such express rights granted to GPC in the Changeover Agreement.[13] Rather, it is logical to assume that GPC's ability to require Plaintiff to take any of these actions arises from the substantial authority granted to GPC, and obligations placed upon Plaintiff, by the terms of the GSA.

74.     Finally, the allegations in the FAC and the evidence offered by both parties establish that the claims in this case arise out of the overall Changeover Transaction between the parties. While Plaintiff contends this matter involves only the Changeover Agreement, it concedes that: (1) "the Changeover Agreement contemplated [Plaintiff] acquiring some corporate owned stores from GPC and several existing, independently-owned . . . stores" (Harrell Aff. ¶ 10); (2) "the Changeover Agreement required significant financial commitments by [Plaintiff]" (*Id.* at ¶ 16); (3) Plaintiff obtained the financing from BOA "under GPC's 'Growth Cap Program'" (*Id.* at ¶ 17); and (4) that Plaintiff entered into the GSA in order to

---

[13] Similarly, Plaintiff has not explained the authority under which GPC is attempting to force it to write down the inventory by $1.4 million.

obtain the financing under the Growth Capital Program (*Id.* at ¶¶ 19 – 25.) Clearly, the acquisition of additional store locations and the financing necessary to accomplish the acquisition were central to the Changeover Transaction.

76.     The Court concludes, in its discretion, that the forum-selection clause in the GSA applies to the claims against Defendants raised by Plaintiff in this lawsuit.[14]

THEREFORE, IT IS ORDERED that Defendants' Motion is GRANTED pursuant to Rule 12(b)(3) and Southeastern's First Amended Complaint is DISMISSED without prejudice. Since the Court has determined that dismissal is appropriate under Rule 12(b)(3), it need and does not address Defendants' Rule 12(b)(6) arguments.

---

[14] The Motion was brought on behalf of "Defendants." Although neither party addressed the issue in its briefing or at the hearing, the Court concludes Riess also may enforce the forum selection clause in the GSA in his individual capacity. The allegations and evidence establish that Riess was a high-level management employee of GPC and was GPC's primary representative in negotiating the Changeover Transaction. Riess, in fact, signed the GSA and the Changeover Agreement on behalf of GPC. Most significantly, all of the allegations regarding Riess involve his statements and conduct in his capacity as a management employee and representative of GPC. *Ellison v. Alexander*, 207 N.C. App. 401, 412–13, 700 S.E.2d 102, 111 (2010) (finding that President and CEO of corporation, who signed stock subscription agreements on behalf of corporation, was entitled to enforce arbitration provisions contained in the agreements where he "was acting as an agent of [the corporation] at the time that the conduct upon which Plaintiffs' claims are predicated occurred, so that Plaintiffs' claims are inextricably intertwined with the provisions of the [agreements]."); *see also Big League Analysis, LLC v. Office of the Comm'r of Baseball*, 2016 NCBC LEXIS 68, *21 (N.C. Super. Ct. Aug. 29, 2016) (finding non-party management official could enforce forum selection clause where claims against official "involve[d] his statements and conduct in his capacity as an official of" party to agreement and affiliated party).

This the 17th day of April, 2017.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases